IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CLIFFORD L. MOORE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 1:06CV422-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Clifford L. Moore brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and Supplemental Security Income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

The medical record reflects that in October 2002, a year before plaintiff's alleged onset of disability, plaintiff was admitted through the emergency room and hospitalized for three days for symptoms of nausea, abdominal pain and faintness resulting from uncontrolled diabetes mellitus. Plaintiff was discharged with prescriptions for Lotrel and Insulin. (Exhibits 1F, 2F). Treatment records for plaintiff's follow-up visits with his treating

physician, Dr. Stone, in the following month note good blood sugar levels. (R. 103-04). In June 2003, plaintiff was treated in the emergency room for a pilonidal cyst. (R. 107-20). On November 15, 2003, plaintiff's alleged onset date, he was again admitted through the emergency room due to uncontrolled diabetes mellitus. Plaintiff reported that he had not taken Insulin for the previous four months because he was unable to afford the medication. (R. 224). A graded exercise test conducted on November 17, 2003 showed evidence of cardiomyopathy, but was negative for ischemia and indicated that plaintiff's exercise capacity and EKG response were normal. An echocardiograph performed on the same day revealed a moderately enlarged left atrium, and a left ventricle dilated at 6.3 cm, with an ejection fraction of 30 percent. Plaintiff was diagnosed with dilated cardiomyopathy. He was discharged on November 19, 2003 on insulin, Coreg, and Altace. Dr. Stone noted plaintiff's limited financial resources and stated that "[w]e will probably need to arrange some sort of assistance through the pharmaceutical patient assistance program for him." (R. 145, 151, 156-57, 216-17). On November 24, 2003, plaintiff filed applications for disability insurance benefits and supplemental security income.

    On February 4, 2004, plaintiff went to the emergency room and reported that he awoke the previous day with numbness and weakness of his left face and arm. He stated that he had used cocaine a few days previously. During his hospitalization, he was diagnosed with a right MCA (middle cerebral artery) stroke and severe obstructive sleep apnea. Plaintiff was discharged from the hospital after six days with discharge medications of Ecotrin, Altace, and Lipitor and a CPAP (continuous positive airway pressure) machine.

(R. 194, 205-09).

On July 6, 2005, after plaintiff's claims were denied at the initial administrative levels, an ALJ conducted an administrative hearing. Plaintiff testified as follows: "Some days" he does not feel "normal" and is "tired, sleepy, easily aggravated." When he does strenuous work, he gets tired easily and sometimes gets chest pains. He tries not to lift over ten to fifteen pounds. (R. 303). He feels tired and sleepy throughout the day and, most days, takes a nap lasting from thirty minutes to an hour and twenty minutes. He uses a CPAP machine, but it does not help because he has to get up to use the bathroom three to four times per night. (R. 304). Sometimes he has no control over his left hand, because of his stroke, and he slurs a lot because mouth is still numb. (R. 305). He gets severe headaches two or three times a month that last one to three hours. He takes insulin shots twice a day, and his blood pressure remains high despite his medication. (R. 306). His memory and concentration "hasn't got worse, but it hasn't got any better." One day, he had chest pain after walking for forty minutes. (R. 307). He still smokes occasionally, but no longer uses cocaine. (R. 309). He mows his cousin's lawn with a riding mower, but has to stop before it is finished because he gets tired and does not feel well. He tries to get out and walk, sit in the sun and visit each day. He takes his medications as he is supposed to, and received a six-month supply from his physician on his previous visit. (R. 310). He is not seeing a doctor on a regular basis because he cannot afford to pay. (R. 312).

The ALJ rendered a decision on October 24, 2005. He concluded that plaintiff suffered from the severe impairments of "type II insulin-dependent diabetes mellitus,

hypertension, cardiomyopathy, sleep apnea, and . . . history of CVA with mild left-sided weakness." (R. 23). He found that plaintiff's impairments did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform his past relevant work as a telemarketer.[1]  Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On April 13, 2006, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails

---

[1] The ALJ concluded that plaintiff retains the residual functional capacity to perform a limited range of work at the light level of exertion. (R. 23). A vocational expert testified that plaintiff's past relevant work as a telemarketer was unskilled and sedentary, and that it was not precluded by plaintiff's residual functional capacity as determined by the ALJ. (R. 317-20).

4

to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff challenges the Commissioner's decision, arguing that: (1) the ALJ erred by concluding that plaintiff did not meet or equal listings 4.02 and 4.04 due to his heart impairment; (2) the ALJ's credibility determination was flawed; and (3) the ALJ's determination regarding plaintiff's residual functional capacity is not supported by substantial evidence because the ALJ relied on a residual functional capacity assessment completed by a disability specialist who failed to consider plaintiff's heart disease.

The Listings. Plaintiff contends that the ALJ erred by concluding that he did not meet or equal the listings for cardiac impairments because plaintiff has evidence of left ventricular enlargement greater than 5.5 cm and an ejection fraction of 30% or less as required by the listings. However, Listing 4.02 requires evidence of left ventricular enlargement or low ejection fraction and chronic heart failure "while on a regimen of prescribed treatment." As the Commissioner notes, plaintiff was not taking medication before his November 2003 diagnostic testing (R. 141), and the record contains no diagnostic study showing chronic heart failure after plaintiff was started on his medication regimen of Altace and Coreg. Plaintiff also refers to listing 4.04B. However, this listing pertains to ischemic heart disease "while on a regimen of prescribed treatment." Again, there is no record of a left ventricular ejection fraction of 30% or less after plaintiff began his medication. Additionally, plaintiff's stress test was negative for ischemia. (R. 218). The ALJ did not err by concluding that

5

plaintiff's impairments did not meet or equal these listings.

<u>The Credibility Determination</u>.  In the Eleventh Circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. "The pain standard requires '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005)(quoting <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991)).  "The standard also applies to complaints of subjective conditions other than pain."  <u>Holt</u>, *supra*, 921 F.2d at 1223.  If this standard is met, the ALJ must consider the testimony regarding the claimant's subjective symptoms.  <u>Marbury v. Sullivan</u>, 957 F.2d 837, 839 (11th Cir. 1992).  After considering the testimony, the ALJ may reject the claimant's subjective complaints.  However, if the testimony is critical, the ALJ must articulate specific reasons for rejecting the testimony.  <u>Id</u>.[2]  "The credibility determination

---

[2] <u>See</u> <u>also</u> Social Security Ruling 96-7p, 61 Fed. Reg. 34483-01 (July 2, 1996):

> When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.  The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

does not need to cite "''particular phrases or formulations'" but it cannot merely be a broad rejection which is "'not enough to enable [the court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole.'"" Dyer, *supra*, 395 F.3d at 1210 (citations omitted).

Plaintiff contends that he meets the pain standard and that the ALJ's determination that plaintiff is not fully credible is not supported by substantial evidence. Plaintiff argues that his medical care was intermittent because he could not afford to seek treatment and that the ALJ erred by failing to discuss plaintiff's financial inability to pay for treatment and medication. (Plaintiff's brief, pp. 11-12). The ALJ listed several reasons for discounting plaintiff's testimony of subjective symptoms, including the inconsistency between plaintiff's allegations and the medical evidence, plaintiff's daily activities, positive reports from plaintiff's treating physician, plaintiff's noncompliance with the recommendations of his physicians and his intermittent medical care.

<u>Inconsistency between plaintiff's allegations and the medical evidence</u>. Plaintiff has been hospitalized twice for uncontrolled diabetes – once more than a year before his alleged onset date and once on November 15, 2003, plaintiff's alleged onset date. Dr. Stone, the physician who treated plaintiff's diabetes, noted in a follow-up visit on December 16, 2003 that "[h]e is applying for disability. He will have to get this on the basis of his cardiomyopathy since he does not have any complications of his diabetes, which will qualify for disability on their own merritt [sic]." (R. 280). Two months later, Dr. Stone reported that plaintiff's blood glucose control is "pretty good," based on plaintiff's report of blood sugars

7

"typically 100 to 150 range." (R. 279). In December 2004, Dr. Stone's treatment note indicates that plaintiff's blood glucose level was 140. (R. 277). Plaintiff reported that he had run out of several of his medications, and Dr. Stone indicated that he would enroll plaintiff in the Merck plan for some of the medications and try to obtain insulin through the Lilly Cares plan. (Id.). At the administrative hearing in July 2005, plaintiff testified that he was taking his medications as he was supposed to and that Dr. Stone had given him a six month supply on his previous visit. (R. 310). There is no indication in the medical record that plaintiff's diabetes caused plaintiff to suffer complications or functional limitations after his November 2003 hospitalization.

In a cardiovascular questionnaire completed on January 1, 2004 in support of his claim for benefits, plaintiff reported that he walks four times a week for exercise, that he experiences a throbbing discomfort on the left side of his chest which begins about twenty minutes into his walk and lasts for ten to fifteen minutes after he rests, and that he had experienced this discomfort for six months. He further reported that he experiences shortness of breath after his walks. (R. 82-83). In a daily activities questionnaire completed on the same date, plaintiff reported that he has trouble with his breathing and chest pains. (R. 93). However, when plaintiff was examined six weeks previously, on November 16, 2003, his physician noted, "Cardiac-wise has had no symptoms; specifically denies any chest pain, shortness of breath, any typical heart failure symptoms of anginal symptoms. While his EKG was noted to be abnormal, the physician stated, "Again, I cannot elicit any cardiac symptoms from him." (R. 221). Similarly, when plaintiff was treated on February 4, 2004 – one month

after he reported chest pain and shortness of breath on his disability application – he denied symptoms of chest pain, shortness of breath or dyspnea. (R. 206, 213). Additionally, as noted above, plaintiff's November 17, 2003 stress test showed evidence of cardiomyopathy, but indicated that plaintiff's exercise capacity was normal. (R. 218).

Plaintiff testified that he "slur[s] a lot" because his mouth is still numb from his stroke. (R. 305). Plaintiff was evaluated by Dr. Sam Banner in a consultative examination on June 22, 2004, four and a half months after his stroke. Dr. Banner noted that plaintiff's speech was audible, understandable and sustainable. (R. 240). Plaintiff reported to Dr. Banner that he had residual weakness to the left side of his body. He stated that he had difficulty holding objects, pushing, pulling, and lifting with his left arm, and that he had fatigue in his left leg after walking or standing for prolonged periods. (R. 239). However, Dr. Banner noted that plaintiff had no difficulty getting on or off of the table, that he was "able to walk normal step, height, and length without deviation from straight line," and to complete a squat without difficulty and with no assistance from exam personnel. He was able to tandem and heel-to-toe walk satisfactorily with no evidence of ataxia. Dr. Banner found plaintiff's muscle strength in all extremities to be 5/5, and noted no atrophy of any muscle group in plaintiff's extremities. He observed that plaintiff's fine and gross motions in both hands were satisfactory, and that plaintiff was able to button and unbutton clothing without difficulty. (R. 241-42).

<u>Plaintiff's daily activities</u>. In a physical activities questionnaire completed on January 1, 2004, plaintiff reported chest pain, shortness of breath and fatigue. (R. 89). He also stated

that he has to "cook in parts" because it sometimes takes two hours to prepare a meal, and that he does not pick up "heavy objects like [he] used to." (R. 86). However, he indicated that his condition does not limit him in personal care, yard work, shopping, loading and unloading groceries or driving a car. (R. 85, 87-88). In a daily activities questionnaire, plaintiff reported that he lives alone, cooks, shops without assistance, does "a little cleaning and some laundry" without assistance, watches television and reads. He visits with family or friends two to three times per week and talks to them on the telephone one to two times per week. He leaves home for visits with relatives and medical appointments, and indicated that someone goes with him to help him by driving. He reads and watches television and is able to remember what he reads and "most" of what he watches on television. (R. 90-92).[3] Plaintiff reported that walks for fifteen to thirty minutes four times per week. (R. 82). Plaintiff testified that he plays cards with friends, vacuums, and cleans his room. (R. 306-08). Plaintiff told Dr. Stone that he "trades off work services for lawn care to pay for his power." (R. 277). At the hearing, plaintiff testified that he mows his cousin's yard but that most of the time, he cannot finish the job because he gets too tired. He testified that he "tr[ies] to get out every day, and do a little walking, sit out in the sun. Do a little visiting." (R. 310).

---

[3] At the hearing, plaintiff's counsel asked whether he could tell any difference with his memory and concentration. Plaintiff responded:

> Sometimes, I'll watch some TV. If I get up and go to the bathroom, while I'm in there, I forget what I was watching. I come back, and I have to rethink what I was doing just to catch up to where I'm at, and it just – I was always just naturally, you just forget for a few minutes, but I don't know. I hasn't got worse, but it hasn't got any better.

(R. 307).

10

The ALJ's failure to discuss plaintiff's inability to afford treatment and medication. Citing Dawkins v. Bowen, 848 F.2d 1211 (11th Cir. 1988), plaintiff argues that the ALJ's credibility determination is not supported by substantial evidence because the ALJ failed to discuss plaintiff's inability to pay for treatment and medication. However, in Dawkins, "the ALJ relied primarily if not exclusively" on plaintiff's noncompliance with prescribed medical treatment in denying her application for benefits. Dawkins, 848 F.2d at 1211. The Eleventh Circuit reversed because of the ALJ's failure to consider plaintiff's ability to afford prescribed medical treatment, observing that "poverty excuses noncompliance." Id. at 1213. The ALJ in the present case noted plaintiff's intermittent medical treatment. However, in discounting plaintiff's testimony of disabling limitations, the ALJ did not rely primarily on plaintiff's failure to seek additional medical treatment. Instead, as noted above, he relied substantially on inconsistencies between plaintiff's testimony and the medical evidence and on plaintiff's daily activities.[4] Under these circumstances, the ALJ's failure to discuss plaintiff's ability to afford treatment does not constitute reversible error. See Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003).

As noted above, the ALJ's conclusion that plaintiff's allegations of disabling fatigue, pain and shortness of breath are not fully credible was based in large part on his observations that they were inconsistent with the medical evidence of record and with plaintiff's reported activities. These reasons are supported by ample evidence, as set forth above. Even

---

[4] The ALJ also noted plaintiff's noncompliance with the recommendations of his physicians. However, it is apparent from the record of the administrative hearing that the noncompliance referenced by the ALJ was plaintiff's failure to completely quit smoking, despite his physician's recommendation to do so. (R. 309).

11

assuming, *arguendo*, that the ALJ erred by considering plaintiff's failure to seek medical care and/or his noncompliance with his physicians' recommendations, the court concludes that the ALJ's credibility determination is supported by substantial evidence.

<u>The ALJ's reliance on the RFC assessment of the disability specialist</u>. Plaintiff argues that the ALJ's residual functional capacity assessment is not supported by substantial evidence because the ALJ relied on an RFC assessment completed by a non-physician disability specialist who did not consider plaintiff's cardiac impairment. Plaintiff argues that "[i]t is clear from reading the report at Exhibit 8F that the person who filled it out either did not have the records of Claimant['s] cardiomyopathy before him or did not read them. There is not a single mention of Claimant's heart disease anywhere in the report." (Doc. # 12, p. 13). This observation is incorrect. The disability specialist noted that "Claimant has borderline enlarged heart." (R. 246). He further found plaintiff's allegations to be partially credible because of the medical evidence of plaintiff's "mildly enlarged heart." (R. 249).[5]

The Commissioner agrees that a disability specialist's RFC assessment alone does not constitute substantial evidence in support of the ALJ's RFC assessment for light work. However, the Commissioner argues that the ALJ's RFC assessment is supported by other substantial evidence of record. Although the ALJ erroneously indicated that the RFC assessment was completed by a medical consultant, his opinion makes clear that he concurred with the RFC assessment in Exhibit 8F only "[a]fter reviewing the entire medical record." (R. 22). The evidence discussed above with regard to the ALJ's credibility determination

---

[5] The disability specialist's handwriting is exceedingly difficult to read, so plaintiff's counsel's failure to see these references to plaintiff's heart disease is certainly understandable.

provides substantial support for the ALJ's conclusion regarding plaintiff's residual functional capacity.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the Commissioner's decision is supported by substantial evidence and is due to be affirmed. A separate judgment will be entered.

Done, this 31st day of May, 2007.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE
